IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

YEE XIONG,

                Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

                Defendant.

OPINION AND ORDER

22-cv-312-slc

_____

      Plaintiff Yee Xiong applied for supplemental security income, alleging that he was disabled because of pain and limitations in connection with his double leg amputations and prosthetics. An administrative law judge denied his claim, finding that in spite of his limitations, Xiong was capable of performing a substantial number of sedentary jobs in the national economy. Xiong now appeals, contending that there is a lack of evidence to support the ALJ's conclusions about his limitations and the jobs he can perform. For the reasons stated below, the court is affirming the decision of the acting commissioner.

FACTS

      The following facts are drawn from the administrative record (AR), filed with the acting commissioner's answer, dkt. 9:

      Xiong is a double leg amputee who uses prosthetics to walk. In March 2020, at the age of 34, he applied for supplemental security income, alleging that he was disabled because of limitations caused by his amputations. After his application was denied initially and on reconsideration, Xiong requested a hearing before an ALJ. The ALJ held a telephonic hearing at which Xiong and a vocational expert testified. Xiong was represented by counsel at the hearing.

      Xiong testified that both legs were amputated below the knee in the fall of 2018.[1] AR 45.

---

[1] According to the medical records, Xiong's legs were amputated below the knees secondary to severe, non-healing ulcers with gangrene and necrosis.

In December 2018, he went to prison, where he used a wheelchair. In mid-2019, he was fitted for and issued temporary prosthetics, and by March 2020 he received his final prosthetics and was able to ambulate with them independently. AR 46; see also AR 20 (summarizing medical history).

Xiong testified that he could not sit, stand or walk for very long with his prosthetics on because of skin problems, pain, and swelling in his knee and lower leg where the stumps connected with the prosthetics. AR 47. He said that while wearing his prosthetics, he could sit continuously for an hour or two, stand for up to 15 minutes, and walk for five or 10 minutes, but only on level ground. AR 48-49. Xiong also testified that his range of motion was limited and he had poor balance, indicating that he had some trouble climbing stairs and ramps, walking on uneven surfaces, or sitting on chairs with low or high seats. AR 44, 50.

After hearing Xiong's testimony, the ALJ called the vocational expert, Thomas Dunleavy. Xiong's counsel stipulated that Dunleavy was qualified to testify, "including his ability to identify work available in the economy and reliably estimate job numbers." AR 52. The ALJ asked Dunleavy whether there were jobs available for a person who:

- could lift or carry 20 pounds occasionally and 10 pounds frequently;
- could sit at least six of eight hours in an eight-hour workday;
- could stand or walk no more than two hours in a workday;
- could occasionally push, pull, or operate foot controls;
- could not climb ladders, ropes, or scaffolds;
- could occasionally climb or descend ramps or stairs, provided there was a handrail;
- could occasionally balance, stoop, kneel, crouch, or crawl;

- could not have even moderate exposure to workplace hazards, including moving machinery or unprotected heights;

- could not operate a motor vehicle as part of work duties; and

- could not have fast-paced production quotas or rates, meaning that any production requirements should be more goal-oriented, such as based on a daily or weekly or monthly quota rather than assembly line work or other similar work.

AR 53.

Dunleavy responded that a person with those limitations would be limited to sedentary work. He cited three sedentary occupations listed in the *Dictionary of Occupational Titles* that fit within the ALJ's parameters: (1) sorters, DOT # 521.687-086 (18,000 jobs nationally); (2) visual inspectors, DOT # 726.684-110 (20,000 jobs nationally); and (3) cashiers, DOT # 211.462-101 (75,000 jobs nationally). Dunleavy testified that, with the exception of about half the visual inspector jobs, which were performed at desk height, all of the jobs were "bench-level jobs, and a person has a stool to shift back and forth on, and they're designed so a person can continue to work either sitting or standing." AR 58.

Dunleavy noted that under the *Dictionary of Occupational Titles*, the cashier job was classified as being performed at the light level of exertion. However, he said, he was aware from his experience that a subset of such jobs, such as those in cinemas and parking lots, could be performed at the sedentary level. Dunleavy said his estimate of 75,000 jobs in the national economy reflected that subset. AR 54-55.

At the ALJ's invitation, Xiong's attorney followed up with Xiong concerning the "chair height issue." AR 61. Xiong said he wasn't able to use his tiptoes to hop himself into a higher seat, like a barstool. AR 62. In response to a question by the ALJ, Xiong said he could get on

3

and off a stool with a seat at buttocks-height, adding that he "might" have some trouble getting off if he had to hop off. AR 65.

After the hearing, the ALJ issued a written decision finding Xiong not disabled, following the five-step sequential evaluation process set forth in the regulations. *See* 20 C.F.R. § 416.920(a)(4). AR. 13–26. Working through the first four steps, the ALJ found that Xiong had severe impairments that, while not presumptively disabling, imposed limitations that limited him to sedentary work with the additional limitations as described in the hypothetical set out above. Xiong's past work was medium, so the ALJ found Xiong had met his burden at step four to show that he couldn't perform his past work. AR 24. But based on Dunleavy's testimony, the ALJ found at step five that Xiong could perform the requirements of representative sedentary occupations such as sorter, visual inspector, and cashier, each of which existed in significant numbers in the national economy. AR 25. Accordingly, the ALJ denied Xiong's application.

The Appeals Counsel subsequently denied Xiong's request for review, making the ALJ's decision the final decision of the commissioner. Xiong now appeals.

OPINION

The court reviews an ALJ's decision on disability benefits under a substantial-evidence standard. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, ⎯⎯ U.S. ⎯⎯, 139 S. Ct. 1148, 1152 (2019). Substantial evidence is not a high threshold; it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (internal citations omitted). If reasonable minds could differ, the court defers to the ALJ's judgment and weighing of the evidence. *See Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

**I. Subjective Symptom Analysis**

Xiong argues that reversal is required because the ALJ "failed to undertake" the subjective symptom analysis required by Social Security Ruling 16-3p. This ruling prescribes a two-step process for evaluating an individual's subjective symptoms. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). First, the ALJ must decide whether the claimant has "an underlying medically determinable physical or mental impairment that could reasonably be expected to produce an individual's symptoms." *Id*. at *3. If this requirement is met, then at the second step the ALJ must consider all of the evidence in the record to evaluate the intensity and persistence of the claimant's symptoms and the extent to which the symptoms limit the claimant's ability to perform work-related activities. SSR 16-3p, 2017 WL 5180304, at *4. At this step, the ALJ examines "the entire case record, including the objective medical evidence; and individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*

The ALJ must explain the subjective symptom analysis "in such a way that allows [a court] to determine whether [the ALJ] reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (internal quotations omitted). Not all the ALJ's reasons for discounting a claimant's subjective complaints need survive scrutiny so long as some of them do. *McKinzey v. Astrue,* 641 F.3d 884, 890 (7th Cir. 2011).

In this case, the ALJ described Xiong's subjective complaints in detail, summarizing both his hearing testimony and function reports. AR 17-18. He noted Xiong's testimony that he had "no range of movement" while wearing his prosthetics and the various limitations he described, including the inability to stand on tip toes, sit on chairs that are too high or too low, squat, kneel, crouch, stoop, or walk on uneven surfaces. The ALJ also noted Xiong's testimony that he

could wear his prostheses for less than half a day, each day, because of skin irritation, and his alleged limited ability to stand because of poor circulation and "being able to feel the bone at one of the stumps." AR 18.

Contrary to Xiong's assertion, the ALJ explicitly conducted the two-step analysis required by SSR 16-3p. At the first step, he found that Xiong's impairments "could reasonably cause at least some of the symptoms" of which he complained. AR 19. Proceeding to the second step, the ALJ found that the objective medical evidence and other evidence in the record did not sufficiently support limitations in functioning greater than those described in the ALJ's RFC assessment. AR 19. The ALJ reviewed the longitudinal medical evidence concerning Xiong's amputations and his subsequent fittings and physical therapy for his prosthetics, which were finally fitted in March 2020. The ALJ noted that the physical therapy notes showed that Xiong was able to ambulate well with his prosthetics, even going downhill, that he rarely lost his balance, and that he was given a crutch only for security to increase his confidence. AR 20. In addition, at follow-up visits, Xiong said he was doing well and denied pain or dysfunction of his extremities, and his treating providers did not note any swelling or skin irritation. The ALJ noted that at one visit, Xiong said he had trouble walking and climbing stairs and said that he might need new prosthetics, but he did not attend a follow up visit that was scheduled with the orthopedic surgeon for that purpose. AR 21.

Xiong argues that the ALJ didn't sufficiently explain why "relevant evidence demonstrating further restrictions" was excluded from the RFC. Dkt. 11, at 15. But with one exception, Xiong doesn't identify any potential limitations that the ALJ didn't address. The ALJ explained that he was rejecting Xiong's allegation that he couldn't walk and stand for up to two hours a day because it was inconsistent with the medical records, which documented no pain symptoms, pain medication use, or abnormalities in Xiong's leg stumps since June 2020. AR 22. The ALJ further explained that a sit-stand option was unnecessary in light of Xiong's testimony

that he could sit for a few hours at a time before needing to stand up, which could be accommodated with normal breaks and lunch periods.

The ALJ also expressly rejected Xiong's claim that he needed a crutch or other assistive device, noting that the physical therapist had issued him a crutch only to increase his confidence and that no use of crutches or other assistive devices was documented in Xiong's primary care records from July 2020 and February 2021. AR 21. Xiong complains that the ALJ didn't consider his alleged problems with balancing or walking on uneven ground, but the ALJ noted that physical therapy records showed that Xiong was not totally precluded from those activities. AR 22. And Xiong doesn't suggest that any of the jobs identified by the VE required more than occasional balancing or walking on uneven ground.

Xiong also argues that the ALJ erred by failing to include an RFC limitation "eliminating the use of a barstool or similar raised work-seat." Dkt. 11, at 16. Xiong testified that he could not get up onto barstools, and the ALJ appears to have accepted this testimony. AR 18. But Xiong didn't say that he couldn't sit on *any* raised seat. To the contrary, he said he could get on and off a stool with a seat around buttocks-height. He did say he "might" have trouble getting off such a stool, but the ALJ was not required to adopt a stool restriction based solely on this equivocal testimony. As the ALJ noted, physical therapy notes documented that Xiong was able to ambulate up and down a curb "many times" using the right or left foot without loss of balance; this indicated to the ALJ that Xiong was able to lift each foot one at a time and then place it down higher or lower onto another level compared to the other foot. AR 20. The ALJ also noted that Xiong was able to perform a number of other activities, such as bending down to pick a rubber band off the ground, while losing his balance only occasionally; when he did, he was able to steady himself. *Id*. From this evidence, the ALJ reasonably concluded that Xiong could "occasionally" balance, which in turn supports his determination that it was not necessary to include a restriction precluding Xiong from sitting on buttocks-height stools.

So at most, the ALJ might have erred by failing to include a limitation on barstools. But this omission was harmless. The VE testified that the jobs he identified were bench-height jobs with a stool, but he did not say that any of them required a stool as high as a barstool. Rather, he described the stool as one that the person could "shift back and forth on" to allow for the person to continue to work "either sitting or standing." AR 59. Although the VE's testimony was not nailed down as tightly as it should have been, the ALJ plainly—and reasonably— understood the VE to mean stools around buttocks height. Further, even if one just considers cashier jobs, it seems commensensical that there are thousands of such jobs that could be performed using a stool of this height. Keeping in mind that the "threshold for . . . evidentiary sufficiency is not high," this court has no reason to believe that the outcome would be any different on remand if a "no barstools" limitation was included. *See Parker v. Astrue*, 597 F.2d 920, 924 (7th Cir. 2010) (harmless error doctrine applicable to judicial review of administrative decisions); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different decision.").

Finally, Xiong argues that the ALJ erred by drawing an adverse inference about the credibility of his complaints based on his failure to attend a scheduled orthopedic appointment in July 2020, noting evidence in the record suggesting that the appointment was cancelled by the orthopedics department. Dkt. 25, at 16-18. But even if the ALJ misconstrued the record, the court would still affirm the ALJ because his other reasons for declining to fully credit Xiong's subjective complaints were sound. *Accord McKinzey*, 641 F.3d at 890-921 (affirming ALJ's credibility determination even though two of plaintiff's three challenges had merit).

In sum, the ALJ complied with his duties under SSR 16-3p. He considered all of Xiong's subjective complaints and cited cogent reasons, supported by evidence in the record, why he did

8

not fully credit them. The evidence cited by the ALJ adequately supports his conclusions; therefore, remand isn't warranted.

## II.  Step Five Determination

Xiong argues that the ALJ's step-five determination is not supported by substantial evidence because the VE's testimony about the jobs that a person with Xiong's RFC could perform conflicts in two respects with the requirements of those jobs as described in the *Dictionary of Occupational Titles*.  First, Xiong argues that a conflict exists between the sorter job and the VE's testimony.  Sprcifically, the ALJ's hypothetical precluded Xiong from work with moving machinery and fast-paced production requirements, yet the DOT described the sorter occupation as working with a conveyor belt. Second, Xiong argues that the 75,000 cashier jobs must be discarded because the DOT describes the cashier job as light, not sedentary, and SSR-04p prohibits the VE from "deviating from the DOT as to the requirements of an occupation." Dkt. 11, at 29. According to Xiong, this leaves only the 20,000 visual inspector jobs, which don't exist in numbers great enough to cross the "substantial" threshold. *See Milhem v. Kijakazi*, 52 F.4th 688, 695 (7th Cir. 2022) (noting that Seventh Circuit case law "does not provide a clear baseline for how many jobs are needed" to satisfy commissioner's burden at step five).

The court need not consider Xiong's challenge to the sorter job or whether the 20,000 visual inspector jobs alone would be significant because Xiong's objection to the cashier jobs rests on a fundamental misunderstanding of SSR 00-4p. Contrary to Xiong's argument, the ruling doesn't prohibit a vocational expert from relying on reliable occupational information, including his own experience, to testify that a certain number of jobs in a given occupation–such as "Cashier II" in this case–are performed at a lighter exertional level than specified in the DOT. SSR 00-4p, 2020 WL 1898704, *3. In fact, the ruling expressly *allows* an ALJ to consider evidence of this sort. *Id*. What it prohibits is for an ALJ to rely on testimony that purports to

9

deviate from the "regulatory definitions of exertional levels," *i.e.*, whether a job is sedentary, light, medium, heavy, or very heavy. *See* 20 C.F.R. § 416.967 (describing physical exertion requirements). In other words, if an occupation requires the ability to frequently lift or carry objects weighing up to 25 pounds, which the regulation defines as "medium" work, *see* § 416.967(c), then the ALJ may not rely on VE testimony that the occupation is "light" work.

Here, the VE did not testify that a job requiring the lifting of up to 20 pounds was not light work. Rather, he testified that, contrary to the DOT, the job of cashier could be performed at the sedentary level in certain work environments. This kind of testimony was permissible under SSR 00-4p. Further, to the extent the VE's testimony conflicted with the DOT, the ALJ could rely on it, but only if the VE offered a reasonable explanation for the conflict. *Id.* at *2. The ALJ explained in his decision that the VE's testimony was reliable because it was based on his training, professional experience, and familiarity with the labor market, along with administratively-recognized sources of job data. AR 25. Further, Xiong's counsel stipulated that the VE had the expertise to testify about job requirements and to estimate job numbers.

On this record, the ALJ reasonably relied on the VE's unchallenged testimony about the requirements of the cashier job and his estimate of how many of those jobs could be performed at the sedentary level. And because 75,000 is well above the threshold of "significance," *see DuCharme v. Kijakazi*, No. 21-2204, 2022 WL 3287974, at *3 (7th Cir. Aug. 11, 2022) (finding 30,000 jobs nationally to be significant), the ALJ's step-five finding, and his ultimate conclusion that Xiong is not disabled, are supported by substantial evidence. Therefore, the court must affirm it.

ORDER

IT IS ORDERED that the decision of defendant Kilolo Kijakazi, Acting Commissioner of Social Security, is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 27th day of September, 2023.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge